UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
EDITH PETERSON, DOUGLAS BACKMAN,        )
MAURICE FOULKE, LIA GLOVSKY, PEGGY )
GRODAN, LOIS KLEMPNER, THOMAS LEE, )
AMY SHERTER LESS, JOSEPH LESS           )
LYNEE E. THORTON, FREIDA ALPERT,        )
Trustee of the Sidney D. Alpert         )
Trust, THOMAS W. BOWEN, Trustee         )
of the Thomas W. Bowen Revocable        )
Trust, PAUL E. COHAN, Trustee of        )
the Paul E. Cohan Revocable Trust,      )
MAUREEN S. DeMARCO, Trustee of the )
Maureen S. DeMarco Revocable Trust,)
ERIC DRUMMER, Trustee of the            )
Alexander R. Zheutlin Trust,            )
MELVIN L. LEVIN, Trustee of the         )
Melvin L. Levin 1992 Trust, GLORIA )
PLOURDE, Trustee of the Gloria J.       )
Plourde Trust, SIDNEY SHERTER,          )
Individually and as Trustee of the )
Beatrice Sherter 1989 Family Trust,)
and as Trustee of the SLS Realty        )
Trust, WENDELL WALKER, Trustee of       )
the Wendell R. Walker Revocable         )
Trust, WILLIAM F. WEBER, Trustee        )
of the William F. Weber Trust,          )
KATHRYN YATES, Trustee of the           )
Kathryn M. Yates Revocable Truste, )
JEFFREY ZHEUTLIN, Trustee of the        )
Jeffrey D. Zheutlin Trust, MARILYN )
ZHEUTLIN, Trustee of the Marilyn C.)
Zheutlin Living Trust, TERRY            )
ZHEUTLIN, Individually and as           )
Trustee of the Alexander R.             )
Zheutlin Trust, and JOSEPH LESS         )
                    Plaintiffs,         )
                                        )
                 v.                     )          CIVIL ACTION
                                        )          NO. 12-10009-WGY
U.S. BANK NATIONAL ASSOCIATION,         )
                    Defendant.          )
_____)

1

MEMORANDUM

YOUNG, D.J.                                    January 23, 2013

## I.    INTRODUCTION

The plaintiff Bondholders (the "Bondholders") in this case are suing U.S. Bank National Association ("U.S. Bank"), their indenture trustee, for its actions during the bond's default, and subsequent sale of the mortgage securing the bonds.  Am. Compl. ("Compl."), ECF No. 7.  The plaintiffs bring seven claims in contract and tort: breach of contract, breach of the implied covenant of good faith and fair dealings, negligence, negligent misrepresentation, breach of fiduciary duty, and violation of Massachusetts General Laws chapter 93A ("Chapter 93A"), sections 9 and 11.[1]

Unlike its prior motion to dismiss, Def.'s Mot. Dismiss Pl.'s Am. Compl. ("Mot. Dismiss"), ECF No. 10, and order thereon, Order, ECF No. 19, U.S. Bank's legal argument for summary judgment is relatively narrow.  U.S. Bank argues that all of the Bondholders' claims are barred by issue preclusion and that the complaint is a "thinly-veiled" collateral attack on the Sale Order.

---

[1] Massachusetts General Laws chapter 93A, sections 9 and 11 both provide remedies for unfair and deceptive acts in the conduct of any trade or commerce made unlawful by Massachusetts General Laws chapter 93A, section 2.

The Bondholders respond by claiming that they were contractually barred from objecting in the Bankruptcy Court, that they were never provided an opportunity to object, and that they were barred from objecting as matter of law.  Pls.' Opp'n Def.'s Mot. Summ. J. 3-4, ECF No. 27.

In order to allow the parties to proceed with discovery, this Court denied the motion for summary judgment on January 4, 2013, Order, ECF No. 35.  This memorandum explains that decision.

### A.   Procedural Posture

This case was filed in the Massachusetts Superior Court sitting in and for the County of Suffolk on December 15, 2011, and removed to the District of Massachusetts on January 4, 2012. Notice Removal, ECF No. 1.  The case was initially assigned to Magistrate Judge Jennifer C. Boal.  Notice Case Assignment, ECF No. 3.  The parties stipulated that the Bondholders could amend their complaint to include Chapter 93A claims and that U.S. Bank could extend its time to file a response.  Stipulation Regarding Pls.' Request Am. Compl. & Def.'s Request Extend Time Filing Resp., ECF No. 6.  The Bondholders filed an amended complaint on January 24, 2012.  Compl.  The parties declined to proceed before the magistrate judge, Notice, ECF No. 9, and U.S. Bank filed a motion to dismiss the amended complaint on February 8, 2012, Mot. Dismiss, ECF No. 10; Mem. Law Supp. Def.'s Mot. Dismiss Am. Compl. ("Def.'s Mem. Mot. Dismiss"), ECF No. 11.

3

The case was reassigned to this session of the Court on February 15, 2012, and this Court granted an extension of time to reply to the motion to dismiss. <u>See</u> Pls.', Edith Peterson, <u>et al.</u>'s Assented Mot. Extension Time File Resp. Mot. Dismiss, ECF No. 13.

After oral argument on April 10, 2012, the Court denied the motion to dismiss, Order, ECF No. 19, and required U.S. Bank to file a motion for summary judgment within two weeks, Electronic Clerk's Notes, Apr. 10, 2012. The Court ordered that no discovery take place until the summary judgment motion was decided. Electronic Clerk's Notes, Apr. 10, 2012. U.S. Bank requested and received an extension shortly thereafter, and filed its motion for summary judgment on May 4, 2012. Def.'s Mot. Summ. J., ECF No. 21. The Bondholders filed their opposition to the motion for summary judgment on May 25, 2012. Pls.' Opp'n Def.'s Mot. Summ. J., ECF No. 27. The Court set the motion for argument in July, but the parties jointly requested an extension. Joint Mot. Reschedule Hr'g Def.'s Mot. Summ. J., ECF No. 26. The Court took the matter under advisement after oral argument on September 19, 2012. Electronic Clerk's Notes, Sept. 19, 2012, ECF No. 34.

B.    Undisputed Facts[2]

Western Massachusetts Lifecare Corporation (the "Debtor" or "WMLC") was a Massachusetts nonprofit corporation established by Baystate Health, Inc. ("Baystate") and Springfield College (the "College") for the purpose of developing, constructing, and operating a continuing care retirement community ("CCRC") named Reeds Landing on the College's campus.  Pls.' Resp. Def., U.S. Bank Nat'l Ass'n's Local Rule 56.1 Statement Undisputed Material Facts & Pls.' Statement Concise Additional Material Facts ("Pls.' Facts") ¶ 1, ECF No. 28.  The Debtor built Reeds Landing on 23.2 acres of land that it leased from the College according to the terms of a Ground Lease dated May 22, 1990, and amended over the ensuing years (as amended, the "Ground Lease").[3]  Id. ¶ 2.

In 2009, the Reeds Landing retirement community included independent living units, assisted living units, a bed nursing care facility, and common facilities for residents.  Id. ¶ 3. The independent living units consisted of 110 apartment units and ten semi-detached, cottage-style cluster homes.  Id. ¶ 4. Sixteen of the assisted living units were specially designed to

---

[2] In responding to U.S. Bank's Rule 56.1 statement, the Bondholders argued that numerous "facts" are hearsay or otherwise inadmissible and should be disregarded.  This recitation includes nothing inadmissible.

[3] The Bondholders claim the Ground Lease was amended only once, while U.S. Bank claims it was amended several times.  Id. ¶ 2.

care for the needs of memory-impaired adults.[4]  Id. ¶ 5.  The
Nursing Center was licensed as a Level II long-term care facility
and was designed to meet the long-term care needs of its
temporary or permanent residents.  Id. ¶ 6.  The common
facilities included a wellness center in which residents could
receive routine medical examinations and assistance with minor
health problems, rehabilitation services, occupational and
physical therapy, and fitness programs.  Id. ¶ 7.  The residents
of Reeds Landing paid a one-time entrance fee and a monthly
service fee based on the size and type of unit and the number of
occupants in the unit.  Id. ¶ 8.  In 2009, the entrance fees
ranged from approximately $161,745 to $540,189.  Id.

     The parties agree that the Ground Lease included a provision
that Reeds Landing could not be used for any purpose other than
health care or related services without the permission of the
College.  Id. ¶ 9.  U.S. Bank characterizes this provision as
restricting the options for sale of Reeds Landing, but the
Bondholders insist that this covenant could have been avoided in
the event of default by the Debtor.  Id.

      In 2006, in order to refinance earlier bonds and to pay for
the construction and development of Reeds Landing, the
Massachusetts Development Finance Agency ("MassDevelopment")

---

     [4] The Bondholders claim these units were closed in December
2007.  Id. ¶ 5.

issued the tax-exempt bonds at issue in this case (the "Bonds")
in the aggregate principal amount of $29,115,000.  Id. ¶ 10.
MassDevelopment is the Commonwealth's finance and development
authority.  Id. ¶ 10.  According to its website, it "works with
private- and public-sector clients to stimulate economic growth
by eliminating blight, preparing key sites for development,
creating jobs, and increasing the state's housing supply."  Id.
MassDevelopment issued the Bonds in accordance with a Loan and
Trust Agreement dated December 1, 2006 (the "Agreement") between
the Debtor, MassDevelopment, and U.S. Bank, not individually but
as indenture trustee.  Id. ¶ 12.  MassDevelopment then loaned the
proceeds of the Bonds to the Debtor for the purpose of
refinancing and improving the Reeds Landing project.  Id. ¶ 13.
The Agreement makes clear that MassDevelopment was not obligated
to repay the Bonds.  Id. ¶ 14.  Instead, the obligation to repay
the Bonds fell solely on the Debtor, which agreed to use the
revenues of Reeds Landing to make the required payments to U.S.
Bank, as trustee for the bondholders.  Id. ¶ 15.  In addition,
U.S. Bank received a lien (for the benefit of the bondholders) on
the Debtor's interest in the leasehold estate created by the
Ground Lease.  Id. ¶ 16.  The Debtor also granted U.S. Bank a
lien on the "Gross Revenues" of Reeds Landing, which included all
receipts, revenues, payments, and other moneys received by or on
behalf of the Debtor from any source, such as entrance fees and

monthly service fees, and assigned to U.S. Bank its interests in the agreements it signed with its residents.  Id. ¶ 18.  The Bondholders also note that the offering statement states that the bondholders have a security interest in the Debtor's personal property, equipment, and fixtures.  Id. at 21 ¶ 2.[5]

Essentially all subsequent material facts alleged by U.S. Bank are disputed.  For example, the Bondholders agree that at some point Baystate and the College agreed to provide bridge loans to the Debtor in the maximum aggregate principal amount of $1,000,000 (collectively, the "Bridge Loan"), but dispute whether the Bridge Loan was to preserve liquidity and prevent immediate shutdown.  Id. ¶ 29.  The Bondholders admit that U.S. Bank agreed that the $1,000,000 Bridge Loan would be senior to U.S. Bank's lien, but do not admit that the subordination was at the written direction of the Majority Bondholders.  Id. ¶ 30.  U.S. Bank also agreed to forebear from exercising any remedies under the Agreement and the Bonds for a limited period of time, again to

---

[5] In their response to U.S. Bank's statement of undisputed facts, the Bondholders numbered their own facts starting from paragraph number one.  To avoid confusion, the Court refers to the Bondholders "undisputed" facts by their page number and paragraph number as assigned by the Bondholders.  U.S. Bank's facts are identified solely by their paragraph number, which is consistent in both their undisputed facts and the Bondholders' response.  See, e.g., Local Rule 56.1 Statement Material Facts Supp. Def.'s Mot. Summ. J. ("Def.'s Facts") ¶¶ 1-70, ECF No. 23; Pls.' Facts 20, ¶ 1.

allow time for an orderly sale of the Debtor's assets.[6]  <u>Id.</u>
¶ 31.

U.S. Bank disclosed these actions to its bondholders,
including the plaintiff Bondholders, but the Bondholders argue
that these disclosures were misleading.  <u>Id.</u> ¶ 32.  U.S. Bank
alleges that it informed the Bondholders, among other material
points, that:

> (a) the Debtor would retain B.C. Ziegler and Company
> ("Ziegler") – a leading investment banking firm in the
> senior living field and the marketing of CCRCs – to
> market the Reeds Landing project;
>
> (b) any sale of the project would be subject to the
> approval of the Trustee and the Directing Holders, as set
> forth in the Agreement;
>
> (c) any Bondholders who were "interested in joining with
> the Directing Holders and becoming actively involved in
> managing the sale process are encouraged to contact the
> Trustee;" and
>
> (d) any Bondholders with any questions about the Notice
> should contact the Trustee.

<u>Id.</u> ¶ 35.  The Bondholders deny the accuracy and completeness of
the summary of such notice.  <u>Id.</u>  The Bondholders claim that this
notice failed to advise Bondholders that they could file
objections with the Bankruptcy Court if they were dissatisfied.
<u>Id.</u> at 28 ¶ 16.  Moreover, when their representative, Thomas
Bartholomew,[7] contacted U.S. Bank, the bank provided a contract

---

[6] This agreement is undisputed.

[7] See <u>infra</u> for a summary of an affidavit by Bartholomew.

requiring that bondholders who wished to participate in decision-making indemnify U.S. Bank for fees and expenses, and indemnify and hold harmless U.S. Bank for actions other than gross negligence, willful misconduct, or breach of fiduciary duties.  Id. at 28-29 ¶¶ 17-20.  The Bondholders deny that none of them contacted U.S. Bank with concerns about the proposed sale.  Id. ¶ 36.  The Debtor retained Ziegler and the law firm Choate, Hall & Stewart LLP to advise it in connection with the potential sale of its assets.  Id. ¶ 37.  The Debtor and Ziegler marketed the Debtor's assets, but the Bondholders dispute that they were marketed in a manner intended to maximize the Bondholders' financial return.  Id. ¶ 39.

The Debtor filed a Chapter 11 bankruptcy petition on May 4, 2009.  Id. ¶ 45.  On May 19, 2009, the Bankruptcy Court issued an order that, among other things, established deadlines and related procedures for competing bids for the assets of Reeds Landing and for any objections to the proposed sale.  Id. ¶ 46.  The Bondholders note that this order was entered after a hearing without any evidence taken, and was not served upon any bondholders.  Id.  Bankruptcy Judge Boroff made the following findings, among others, in the Sales Procedures Order:

> a. The Debtor's proposed notice of the Proposed Sale, the Sale Procedures, the Auction and the Sale Hearing . . . is good, appropriate, adequate and sufficient, and is reasonably calculated to provide all interested parties with timely and proper notice of the

> Proposed Sale, the Auction, the Sale Procedures and the
> Sale Hearing;
> b. The entry of this Order is <u>in the best interests of
> the Debtor, its estate, its creditors and other parties
> in interest</u>, as the Debtor will, among other things,
> retain for the benefit of the Debtor's estate the
> prospect of a successful sale to the Stalking Horse
> Bidder [Loomis] while enabling the Debtor to solicit
> competing bids.

<u>See</u> Sales Procedures Order ¶¶ D, J at 2-3, 4 (emphases added).
Again, the Bondholders do not dispute the terms of the order, but
note that they did not receive notice.  Pls.' Facts ¶ 47.  The
Bankruptcy Court then set a deadline of July 21, 2009, for "a
party wishing to submit a higher and better offer for the
Assets," and scheduled an auction and Sale Hearing for the assets
of Reeds Landing for July 28, 2009.  <u>Id.</u> ¶ 48.  The Bondholders
note that offers were intended to comply with strict guidelines,
all of which contemplated that U.S. Bank would subordinate its
lienhold interest and receive only a small percentage of what it
was owed.  <u>Id.</u>  The Bankruptcy Court ordered that any objections
to the entry of the Sale Order needed to be in writing, had to
include the basis for the objection, and needed to be served no
later than July 21, 2009.  <u>Id.</u> ¶ 49.

The Bankruptcy Court found that closing Reeds Landing would
significantly depress its value and not be in the best interests
of the Debtor, its estate, residents, or creditors.  <u>Id.</u> ¶ 50.
The Bondholders agree that Bankruptcy Judge Boroff made these
findings, but note that they were made on representations of

counsel without receiving any evidence or alternatives to sale to Loomis[8] that might preserve U.S. Bank's first lienhold interest. Id.

The subsequent notice to bondholders apprised them of the sale, the proposed bid by Loomis, and that the bankruptcy would have an adverse effect on their Bonds.  Id. ¶ 51.  Bondholders with questions were advised to contact U.S. Bank or its counsel. Id.  Another notice from U.S. Bank a few weeks later on June 9, 2009, notified bondholders that the proposed sale was subject to Bankruptcy Court approval and intended to maximize recoveries for all creditors.  Id. ¶ 56. The Auction and Sale Hearing took place as scheduled on July 28, 2009.  Id. ¶ 59.  The sale process resulted in qualified offers from Five Star Quality Care, Inc. ("Five Star") and Loomis.  Id.  After further bidding by Loomis and Five Star at the auction, Loomis submitted a final offer for the Project that included $3,550,000 in cash consideration, and Five Star submitted a final bid that included $3,301,000 in cash consideration.  Id. ¶ 60.  U.S. Bank claims that it had written direction from the Majority Bondholders to consent to the final offer submitted by Loomis.  Id. ¶ 61.  Judge Boroff approved the sale of the assets of Reeds Landing to Loomis on August 3, 2009. Id. ¶ 62.

---

[8] Loomis is the qualified bidder whose offer was accepted by the creditors and recommended and approved by the Bankruptcy Court.  See Ex. 3, Tr. Hr'g, July 28, 2009, 7, 24.

### C.    The Bondholders' Additional "Facts"

The Bondholders submit several affidavits and the transcript of the bankruptcy hearings to support their disputed version of the facts.

#### 1.    The Plush Affidavit

The Bondholders submitted an affidavit by Alan C. Plush, a Member of the Appraisal Institute ("MAI") and an experienced appraiser of health care and senior housing.  Aff. Alan C. Plush, MAI, ECF No. 30.  Plush purports to have valued over 1000 CCRCs. Id. ¶ 2.  In 2009, he was retained by Peoples Bank, in Massachusetts, to provide an appraisal of the CCRC known as Reeds Landing.  Id. ¶ 3.  As part of his contract, he agreed to treat his opinion of value and other financial information as confidential, and Peoples Bank has refused to release him from this confidentiality obligation.  Id. ¶¶ 4-5.

Although he cannot at this time disclose the valuation provided to Peoples Bank, Plush believes the information necessary properly to prepare an appraisal is in Ziegler's "Sale Book," which was provided to potential purchasers in connection with the auction.  Id. ¶¶ 5-6.  U.S. Bank has not produced that book despite requests to do so.  Id. ¶ 7.  Plush states that he cannot currently provide a scientific and defensible opinion of value for Reeds Landing,[9] but in his opinion, to a reasonable

---

[9] Presumably, he also remembers his valuation from 2009.

13

degree of professional certainty, there were other preferable
alternatives to the Loomis auction sale.  Id. ¶¶ 10, 19.

In essence, Plush states that the auction of Reeds Landing
was not the best way to realize full market value.  Id. ¶ 20.  A
better plan would have been to bring in competent management  and
to stabilize and improve operations over time, which would
improve the value of Reeds Landing, and correspondingly, the
value of the Bonds.  Id. ¶¶ 21-22.  He claims that another more
preferable alternative would have been for U.S. Bank to negotiate
with representatives of Reeds Landing residents to recover a
larger percentage of any sale.  Id. ¶ 25.  U.S. Bank had
tremendous leverage because it was in a position to foreclose,
which would have been disastrous to the residents inasmuch as
their claims would have thereby been extinguished.  Id. ¶ 26.
The residents, therefore, had a strong incentive to negotiate a
deal permitting U.S. Bank to recover on behalf of Bondholders a
larger portion of any sale.  Id.

Based upon the foregoing and a statement summarizing the
known assets at Reeds Landing, Plush claims, to a reasonable
degree of professional certainty, that had U.S. Bank asserted its
liens, it would have recovered significantly more than it had
from the auction sale to Loomis.  Id. ¶ 28.  He even speculates
that had U.S. Bank enforced its liens, U.S. Bank would have
recovered the Bondholders entire investment, most probably in

14

continuing payments over time in accordance with the prior arrangement with the Debtor.  Id. ¶ 29.  Plush further alleges that, in his experience, it is unusual for someone in a first lienhold position (like U.S. Bank) to subordinate its obligations to the residents.  Id. ¶ 30.  Such an odd arrangement would likely deter potential purchasers from bidding in order to avoid entanglement in predictable lawsuits such as this one, which would arise from dissatisfied bondholders.  Id.

### 2.  Bartholomew Affidavit

Thomas J. Bartholomew is an investor who since 1981 has been actively involved in the municipal bond business serving in various capacities, including as an underwriter, fiscal advisor, and retail portfolio manager.  Aff. Thomas J. Bartholomew ("Bartholomew Aff.") ¶ 1, ECF No. 29.  In 2006, Bartholomew recommended the Reeds Landing Bonds to a number of his clients, including all of the Bondholders in this action.  Id. ¶ 2.  None of the Bondholders are institutional investors.  Id. ¶ 4.  Each bondholder is either an individual investor investing his or her own money or a trustee of a private family trust.  Id.

Shortly after December 31, 2008, Bartholomew received a notice informing bondholders of the deteriorating financial situation of the Debtor, and advising them to contact U.S. Bank if they wished actively to manage the sales process. Id. ¶¶ 5-6. Bartholomew instructed his attorney, Michael Angelini

("Angelini"), to inquire of U.S. Bank about the role of bondholders interested in joining the Majority Bondholders in managing the sale process. Id. ¶ 7. In reply, U.S. Bank provided Bartholomew a contract for bondholders who wished to participate, which required that the bondholders grant indemnity to U.S. Bank for any claims "'arising out of, or related to the taking, by [U.S. Bank] of action, in accordance with a Direction' from the Bondholders Committee." Id. Bartholomew and Angelini disliked U.S. Bank's terms requiring that the bondholder grant indemnity to U.S. Bank and recommended to the bondholders that they not relinquish any rights, as U.S. Bank had fiduciary duties to them. Id. ¶¶ 7-8. Bartholomew subsequently received notice of the proposed sale to Loomis and that the bondholders would receive approximately ten percent of their investments. Id. ¶ 9.

In response to the proposed sale, Bartholomew contacted counsel for U.S. Bank and a representative of the Majority Bondholder, Mary Jane Minier of VanKampen Merrit Morgan Stanley, who allegedly owned approximately seventy-two percent of the outstanding bonds. Id. ¶¶ 9, 12. Bartholomew advised Minier and the U.S. Bank attorneys that he had spoken "at great length with other CCRC operators who indicated their reluctance to offer a bid . . . in the form required in the offering, because they had never been asked to treat the first lienholder in the fashion

outlined." <u>Id.</u> ¶ 14; <u>see also</u> <u>id.</u>, Ex. B, Email, Mass DFA Reed's Landing, June 8, 2009, ECF No. 29-2.

Bartholomew also includes an email he procured stating that Springfield College would not offer to another potential client (Covington Investments) the same terms being offered to Loomis. Bartholomew Aff. ¶ 20; <u>see also</u> <u>id.</u>, Ex C, Email, FW: Western Massachusetts Lifecare Corporation, d/b/a/ Reeds Landing - Covington Investments, LLC Bld, July 23, 2009, ECF No. 29-3. Bartholomew concluded that Loomis was receiving favored treatment unavailable to other bidders. <u>Id.</u> ¶ 21.

Although Bartholomew knew that bondholders and non-attorneys could not object at the bankruptcy hearing and auction, he attended the hearing to express concerns; he was not permitted to speak. <u>Id.</u> ¶ 22.

### D.   The Bankruptcy Court Hearings

The Bondholders also point to the transcript of the bankruptcy court hearing to show that U.S. Bank breached its fiduciary duty.

In a hearing on May 6, 2009, Bankruptcy Judge Boroff heard a number of motions, mostly dealing with keeping Reeds Landing running as it became insolvent. <u>See</u> Ex. 2., Tr. Hr'g, May 6, 2009, ECF No. 32 (listing motions in front of court). Different comments from the hearing alternately support both the idea that the sale was potentially unfair to the bondholders and the claim

17

that Reeds Landing was so insolvent that a hasty resolution was necessary.  The most important and contentious motion was for using cash collateral to pay operating expenses and wages.  <u>See</u> <u>id.</u> at 16.  The Debtor argued that, although all its cash was encumbered by liens to bridge lenders and bondholders, the value of the business would decline rapidly if it were forced to cease operations.  <u>Id.</u>  The Debtor's attorney acknowledged that bondholders would take "a fairly large hit here" while providing for the residents and argued that this was fair and reasonable under the circumstances.  <u>Id.</u> at 20.

In reviewing the order, the Bankruptcy Judge specifically included the terms "based on the representations of counsel" within the final order on the cash collateral, noting that he did not have an opportunity to listen to testimony.  <u>Id.</u> at 22.  When asked, the U.S Bank representative pointed out that the bondholders were owed more than $28 million with a senior position on the assets.  <u>Id.</u> at 24.  U.S. Bank noted that the bondholders had been offered $2,750,000 (less than ten percent), while the residents were owed approximately $10 million to $14 million and would receive the full amount.  <u>Id.</u> at 25.  As a result, U.S. Bank argued that the Bankruptcy Court ought approve the provision, including an unusually long period of time for the Creditor's Committee to challenge the security interest of the lenders.  <u>Id.</u> at 25.  The Bankruptcy Judge requested that the

18

issue be tabled until the final sale hearing, when the Creditors'
Committee would have appointed counsel. Id. at 26 (noting the
court would "certainly pay serious attention to it"). U.S.
Bank's counsel ("Bleck") later explained that the Debtor was
"hemorrhaging" and in negative cash flow. Id. at 40. He also
noted that the proposed sale process would pay in full
ninety-five percent of the unsecured creditors. Id. at 41.
Bleck's final point was that the Sale Order needed to be approved
as soon as possible, as a competing bidder in the process would
slow down the final sale. Id.

The Debtor noted that it would be difficult to provide
notice to the individual bondholders, and the court agreed that
notice to the indenture trustee (U.S. Bank) would be adequate.
Id. at 37. The court required the Debtor to serve notice on all
unsecured creditors. Id.

The final hearing approving the sale and the cash collateral
order occurred on July 28, 2009. Ex. 3, Tr. Hearing, July 28,
2009, ECF No. 33. The Debtor, two "qualified" bidders (Loomis
and Five Star), creditors Springfield College, Baystate Health,
and U.S. Bank, and the Committee of Unsecured Creditors were
represented before the Bankruptcy Court.[10] Id. at 2, 7. Two

---

[10] Although counsel for qualified bidder Loomis did not make
an official appearance before the Bankruptcy Court, a Loomis
representative was presumably present at the hearing. See Ex. 3,
Tr. Hr'g, July 28, 2009, 1, 7, 24 (informing the court that the
debtor wished to accept a bid Loomis submitted to the court that

other bids were received, which the Debtor concluded were not qualified, one because of a financing contingency with Covington Investments[11] and an admittedly financially viable bidder, Top Rock, who was unwilling to waive a due diligence provision of twenty days.  Id. at 8-9.  Loomis had a financing contingency, but the Debtor found it satisfactory.  Id. at 13-14.  After a short recess, all present creditors recommended the Loomis bid to the Bankruptcy Court as the best bid.  Id. at 24.  Five Star disagreed, explaining how its bid was worth more money, included promises of capital investments, and had no financing contingency.  Id. at 24-25.

In response, the Unsecured Creditors Committee (i.e., the residents) stated that they preferred the Loomis bid and that the residents had "become very comfortable over the last several months as Loomis has been in and out of the facility on numerous occasions[,] and . . . residents have a great deal of confidence in their ability to continue the operations . . . at the high level of care that they're used to . . . from Reeds Landing."  Id. at 26.

---

day).

[11] Bartholomew noted in his affidavit that Covington Investments' counsel complained on July 23, 2009 that it was not receiving the same terms with regards to timing of payment as did the stalking horse bidder, Loomis, and therefore would not submit a bid.  Ex C, Email, FW: Western Massachusetts Lifecare Corporation, d/b/a/ Reeds Landing - Covington investments, LLC Bld, July 23, 2009, ECF No. 29-3.

In a brief statement, U.S. Bank counsel Bleck stated that it were not "thrilled" with the auction, but supported the Loomis offer. Id. at 27. Bleck noted that U.S. Bank's consent to the sale was "based upon the representations the speed and necessary [sic] to close this transaction, given the current financial nature of the company." Id. In closing, he stated that U.S. Bank "understand[s]" that Loomis had the cash and financing commitment needed to close the sale. Id.

Then, Bartholomew attempted to speak and was excused, as he did not have verification that he represented bondholders. Id. at 27-28. At the end of the hearing, the Bankruptcy Court endorsed a retroactive order approving Ziegler as the investment bank supporting the Debtor in the sale. Id. at 31. Ziegler's fees "came directly out of the bondholders' pocket," which the Bankruptcy Judge described as the "only reason" to allow it. Id. at 30. The Bankruptcy Judge and the U.S. Trustee both subsequently expressed a concern that the retroactive order had no precedential value and was very unusual. Id. at 31.

### E. Federal Jurisdiction

This Court may exercise diversity jurisdiction over the parties because they are "citizens of different states," and the amount in controversy exceeds $75,000. See 28 U.S.C. §§ 1332, 1348. U.S. Bank National Association is a national bank, with its corporate headquarters in Cincinnati, Ohio. Compl. ¶ 27. By

21

statute, national banks[12] are deemed to be citizens of the States in which they are located.  28 U.S.C. § 1348.  In <u>Wachovia Bank</u> v. <u>Schmidt</u>, 546 U.S. 303 (2006), the Supreme Court unanimously decided that for purposes of diversity jurisdiction, a national bank is a citizen only of the state in which "its main office, as set forth in its articles of association, is located."  <u>Id.</u> at 307.  Therefore, U.S. Bank is a citizen of Ohio.[13]  The twenty-five plaintiffs are citizens of a variety of states (although largely Massachusetts), but none are citizens of Ohio. As a result, complete diversity of citizenship exists between the parties.

The Bondholders claim damages of not less than $3,628,000, not including treble damages under Massachusetts General Laws chapter 93A.

## II.  ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, . . . admissions on file, . . . [and] affidavits" show "the absence of a genuine

---

[12] National banks are those chartered not by any State, but by the Comptroller of the Currency of the U.S. Treasury. <u>Wachovia Bank</u> v. <u>Schmidt</u>, 546 U.S. 303, 306 (2006).

[13] The Court takes judicial notice that U.S. Bank is a citizen of Ohio.  <u>See</u> <u>National Banks and Federal Savings Associations</u>, Off. Comptroller Currency, (Dec. 31, 2012) http://www.occ.treas.gov/topics/licensing/national-bank-lists/index-active-bank-lists.html.

issue of material fact." <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 323 (1986).  When determining a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in favor of the nonmoving party.  <u>Pineda</u> v. <u>Toomey</u>, 533 F.3d 50, 53 (1st Cir. 2008).  An issue of fact is genuine if there exists a sufficient evidentiary basis on which the trier of fact could find for the non-moving party.  <u>Anderson</u> v. <u>Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1985).  A fact is "material" if it will affect the outcome of the case under the applicable law.  <u>Id.</u>  Save as to facts admitted by both parties, courts must disregard all evidence - even if unopposed - which the jury is free to reject, i.e., all evidence upon which a party bears the burden of proof.  <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000).

**B.   Issue Preclusion Does Not Bar the Bondholders' Suit**

U.S. Bank's central argument is that the Bondholder's entire suit is barred by issue preclusion.[14]  U.S. Bank argues that

---

[14] U.S. Bank also argues that the Bondholders are impermissibly seeking to overturn the Bankruptcy Court's Sale Order.  Mem. Law Supp. Def.'s Mot. Summ. J. 11, ECF No. 22.  To support its argument, U.S. Bank relies on <u>Gekas</u> v. <u>Pippin</u> (<u>In re Met-L-Wood Corp.</u>), 861 F.2d 1012 (7th Cir. 1988).  In <u>Met-L-Wood</u>, the Seventh Circuit noted that creditors who made an appearance in a bankruptcy proceeding were barred by claim preclusion (<u>res judicata</u>) from bringing a separate suit against their trustee. <u>Id.</u>, 861 F.2d at 1016-17.  The court, however, acknowledged that creditors who did not appear in the bankruptcy proceeding would not be subject to claim preclusion.  <u>Id.</u> at 1017.  Writing for the court, Judge Posner explained that the remaining creditors were also barred because the bankruptcy proceeding under section

because the Bankruptcy Court decided the sale of Reeds Landing
was "in the best interests of the Debtor, its estate, its
creditors, and other parties in interest," the Bondholders may
not proceed to trial on its claims that U.S. Bank violated its
fiduciary duty.  Mem. Law Supp. Def.'s Mot. Summ. J. ("U.S. Bank.
Mem. Supp. Summ. J.") 13, ECF No. 22.  "Issue preclusion bars
successive litigation of 'an issue of fact or law' that 'is
actually litigated and determined by a valid and final judgment,
and . . . is essential to the judgment.'"  <u>Bobby</u> v. <u>Bies</u>, 556
U.S. 825, 833 (2009) (wuoting Restatement (Second) of Judgments
§ 27 (1980)); <u>accord</u> <u>Mercado-Salina</u> v. <u>Bart Enters. Int'l, Ltd.</u>,
671 F.3d 12, 21-22 (1st Cir. 2011).  The First Circuit requires
four separate elements for the application of issue preclusion:

> (1) that the issue to be precluded is the same as that
> disputed in a prior proceeding, (2) that the issue was
> actually litigated in the earlier proceeding, (3) that
> the issue was determined by a valid and binding final
> judgment or order, and (4) that the determination of the
> issue in the prior proceeding was essential to the final
> judgment or order.

<u>Enica</u> v. <u>Principi</u>, 544 F.3d 328, 337 (1st Cir. 2008).  The
purpose of issue preclusion doctrine is to prevent a party from

---

363 is an <u>in rem</u> proceeding "good against the world."  <u>Id.</u>  In
<u>Met-L-Wood</u>, the complaining creditors did not dispute that a sale
was necessary, but rather disagreed with the terms of sale.  <u>Id.</u>
Here, the Bondholders allege not only that the sale was a
"sweetheart deal" but that the sale was unnecessary and that U.S.
Bank had a fiduciary duty to explore other options leading to
higher recovery for all bondholders.  Pls.' Opp'n Def.'s Mot.
Summ. J. 3.

relitigating an issue where there has been full and fair litigation.  In re Kane, 254 F.3d 325, 329 (1st Cir. 2001).  Even where the core requirements of issue preclusion are met, an exception may apply when a change in the legal context intervenes.  Bobby, 556 U.S. at 834.  The party claiming preclusion has the burden of showing that the prior decision "involved actual resolution of the issues."  Wade v. Brady, 460 F. Supp. 2d 226, 242 (D. Mass. 2006) (Gertner, J.) (citing 18 Wright, Miller & Cooper § 4420).

The First Circuit, like most courts, generally follows the approach in the Restatement (Second) of Judgments.  See, e.g., Kane, 254 F.3d at 328; Troy v. Bay State Computer Grp., Inc., 141 F.3d 378, 383 (1st Cir. 1998) (citing Restatement (Second) Judgments Section 28 as a good guide for the "numerous exceptions to collateral estoppel").  In particular, the Restatement offers a number of reasons why there might be a "clear and convincing need for a new determination" of an issue, such as the potential adverse impact on the public interest, the issue was not sufficiently foreseeable at the time of the initial action, or the precluded party "did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action."[15]  Restatement (Second) of Judgments § 28(5).

_____

[15]  The Restatement (Second) of Judgments includes the following comment on exceptions to issue preclusion:

### 1.   Identity of Issues

"Defining the issue precluded . . . [is] one of the most difficult tasks" in issue preclusion.   In re Relafen Antitrust Litig., 286 F. Supp. 2d 56, 65 (D. Mass. 2003).   After pointing to the Bankruptcy Court's Sale Order, U.S. Bank identifies the "issue underlying each of the plaintiffs' claims as whether the sale of Reeds Landing was in the plaintiff's best financial interests."   U.S. Bank. Mem. Supp. Summ. J. J. 13.   For issue preclusion to apply, the issue raised in this suit must be "identical in all respects to that decided in the first proceeding."   Enica, 544 F.3d at 337 (quoting Faigin v. Kelly, 184 F.3d 67, 78 (1st Cir. 1999)) (internal quotation mark omitted).   The Bondholders have seven claims in contract and tort: breach of contract, breach of implied covenant of good faith and fair dealings, negligence, negligent misrepresentation, breach of fiduciary duty, and Massachusetts General Law chapter

---

g. Rationale for Subsection (5).   As stated in the introduction to Title E, the policy supporting issue preclusion is not so unyielding that it must invariably be applied, even in the face of strong competing considerations.   There are instances in which the interests supporting a new determination of an issue already determined outweigh the resulting burden on the other party and on the courts.   But such instances must be the rare exception, and litigation to establish an exception in a particular case should not be encouraged. Thus it is important to admit an exception only when the need for a redetermination of the issue is a compelling one.

Restatement (Second) of Judgments § 28 cmt. g.

26

93A, sections 9 and 11.  Compl. 2.  While the issue of "best

financial interests" seems to align with those of breach of

implied covenant of good faith and fair dealing, negligence, and

breach of fiduciary duty, the Court is skeptical that this also

precludes actions for breach of contract and Chapter 93A.  Taking

the facts and inferences in favor of the Bondholders, it is

certainly possible that the sale of Reeds Landing was the best

deal available, but that U.S. Bank otherwise misled the

Bondholders and breached their contract with it.  At a minimum,

the breach of contract and Chapter 93A claims are not here

subject to issue preclusion.

### 2.   Actually Litigated

The key factor here is whether the issue was actually

litigated.  To be "actually litigated," the issue must involve

"something more than having an issue 'resolved' as a result of

some determinative legal doctrine that short-circuits the

merits." <u>Kane</u>, 254 F.3d at 329.  The issue must have "been

properly raised, submitted for determination, and necessarily

determined by the earlier decision." <u>Wade</u>, 460 F. Supp. 2d at

240.  That is not to say that an issue actually litigated must be

explicit - the court may determine it was actually litigated if

"logically or practically, a necessary component of the decision

[was] reached in the prior litigation." <u>Grella</u> v. <u>Salem Five</u>

<u>Cent Sav. Bank</u>, 42 F.3d 26, 31 (1st Cir. 1994) (citing <u>Dennis</u> v.

R.I. Hosp. Trust Nat'l Bank, 744 F.2d 893, 899 (1st Cir. 1984));

accord Stoehr v. Mohamed, 244 F.3d 206, 209 (1st Cir. 2001)

(holding that the issue of fraud was precluded because the

previous jury necessarily considered fraud as the basis for

Chapter 93A liability).

     An issue has not been "actually litigated" when the matter

is admitted without controversy.  See Wade, 460 F. Supp. 2d at

240-41; Relafen Antitrust Litig., 286 F. Supp. 2d at 70 (citing

Kane, 254 F.3d at 329) (noting that matters that are "admitted

without controversy" do not qualify for preclusive effect).  In

Young v. City of Providence ex rel Napolitano, 404 F.3d 4

(1st Cir. 2005), the First Circuit noted that while a voluntarily

dismissed claim had claim preclusion, it did not have an issue

preclusive effect because the factual question was not actually

litigated.  Id. at 35 n.17; cf. Keystone Shipping Co. v. New Eng.

Powers Co., 109 F.3d 46, 52 (1st Cir. 1997) (finding issue was

"actually litigated for preclusion purposes because it was

'subject to an adversary presentation and consequent judgment'

that was not 'a product of the parties' consent and is a final

decision on the merits." (quoting Jack H. Friedenthal et al.,

Civil Procedure § 14.11, at 672, 673 (1985)).

     Here, the Bankruptcy Court took no evidence on the fairness

of the sale, but relied on the agreement of all parties to the

bankruptcy.  The Bankruptcy Court explicitly required the parties

to note that the cash collateral order was based on the
representations of counsel.  Ex. 2, Tr. Hr'g 22.  The Bondholders
did not receive notice of the sale and their representative was
not permitted to object at the hearing.  <u>See</u> Pls.' Facts
¶¶ 46-47; Bartholomew Aff. ¶ 22.  More importantly, U.S. Bank
summarily endorsed the Sale Order, with counsel literally
speaking just a few sentences.  Ex. 3, Tr. Hr'g 27.  Although
counsel for U.S. Bank briefly mentioned the shortcomings of the
sale, <u>id.</u> ("[O]bviously, we're not thrilled with the results of
the auction."), it did not dispute any of the facts related to
the sale.  Counsel stated, "[w]e also understand based upon the
representations the speed and necessary [sic] to close this
transaction, given the current financial nature of the company."
<u>Id.</u>  Not only did U.S. Bank consent to the sale without evidence
on the record, but it is not clear from the transcript whether
its decision was based on the representations of the Debtor's
counsel or on actual documentation.  <u>See</u> <u>id.</u>

     Taking the facts in the light most favorable to the
Bondholders, U.S. Bank's consent took place in the context of a
sale by a Debtor who had a strong incentive to sell to a
nonprofit and apparently had picked a suitable nonprofit for the
sale and the obvious (and reasonable) pressures on the Bankruptcy
Court to approve a sale that provided for the residents of Reeds
Landing, even at the expense of the secured creditors.  In

theory, the Bondholders' indenture trustee held all the cards - they had a lien on the Debtor's interest in the leasehold estate, Pls.' Facts ¶ 16, a lien on gross revenues, id. ¶ 18, a security interest in personal property and fixtures, id. 21, ¶ 2, and rights to Reeds Landing's revenues, id. ¶ 15.

It may be that U.S. Bank was duly diligent, knew the details of Reeds Landing's financial statements, consulted the auction bidders, and had carefully concluded that the proposed sale was the best alternative to recover for bondholders. Such a conclusion, however, is not required by the undisputed facts or the Bankruptcy Court hearing transcripts.

### a. Bondholder Standing

Although not central to the analysis, it seems unwise to ignore the fact that the Bondholders likely could not have raised their claims in the bankruptcy proceeding.[16] As an issue for preclusion that is actually litigated must have turned on the merits, it matters a great deal if the Bondholders were prohibited from arguing that their interests were being violated.

Massachusetts law governing trusts adds just such an additional wrinkle. In Chamberlain v. James, 294 Mass. 1 (1936),

---

[16] The parties disputed this in their motion to dismiss alleging claim preclusion, but claim preclusion is not now raised in U.S. Bank's motion for summary judgment. While the Court does not intend to conflate claim preclusion and issue preclusion, the analysis of the Bondholders' standing is undoubtedly helpful in demonstrating whether the issue was actually litigated.

the Supreme Judicial Court addressed squarely the relationship between bondholders and an indenture trustee holding a mortgage for the bondholders.  Id. at 7.  In Chamberlain, the court noted that the bondholders were not mortgagees, and not authorized as agents, or in any other capacity, to act for the trustee.  Id. The court concluded that "the bondholders were required to enforce their rights through the intervention of the trustee." Id.  In First National Fire Insurance Co. v. Salisbury, 130 Mass. 303 (1880), the Supreme Judicial Court similarly found that bondholders had "no means of enforcing their rights in the mortgaged property, except through the action of the [indenture trustee defendants]."  Id. at 311.  The court held that where the indenture trustee failed faithfully to perform his fiduciary duties, the plaintiff bondholders were entitled to bring suit. Id.

These cases, although hardly recent, do suggest that the plaintiff Bondholders lacked legal rights to enforce the terms of the mortgage held by the Trustee.  The terms of their Agreement seem to reinforce this point, as the Bondholders are precluded from enforcing the Agreement unless, among other things, there is a default and the Trustee has failed to exercise his powers in spite of a request to institute proceedings by a majority of the Bondholders.  Ex. A-1, Agreement § 709, ECF No. 12.  The Agreement also explicitly gives the Trustee the authority to file

proofs of claim in any bankruptcy proceeding, including to vote for the bondholders of all bonds "in the manner designated by the Majority of the Bondholders." Agreement § 714. Further, the July 10, 2009, notice to Bondholders states that "individual Bondholders <u>do not</u> need to file proofs of claim in the Bankruptcy Proceedings to the extent a Bondholder's claims 'relate to [payments from the Bonds].'" Def.'s Mem. Supp. Mot. Dismiss, Ex. E, Notice Bondholders Regarding Bar Date File Claims 2, ECF No. 11-8.

To further this inquiry, this Court is persuaded by the reasoning in In re Refco, 505 F.3d 109 (2d Cir. 2007). There, the Second Circuit ruled that investors lacked standing to appear before the bankruptcy court because they were not a party in interest within the definition of the Bankruptcy Code. <u>Id.</u> at 119. The court noted that a bankruptcy judge's role is "to determine whether a settlement is in the best interests of <u>the estate</u>, not to ensure that the <u>creditors'</u> representatives are honoring their fiduciary duties." <u>Id.</u> Although Refco was a bankruptcy appeal, the court, in dicta, acknowledged that the bondholder creditors could file a separate suit alleging breach of fiduciary duty if they failed  successfully to intervene in the bankruptcy. <u>Id.</u>

While <u>Refco</u> did not involve a trustee-bondholder relationship, but rather indirect interests in equity

investments, the Second Circuit's decision appears to hinge on the control exercised by the corporate leadership (instead of investors). Id. at 117. Just as in Refco, the bondholders here entrusted their money to the indenture trustee, U.S. Bank, and it is doubtful whether they could have successfully "assert[ed] a claim" on behalf of the Trust, or be "permitted to negotiate a settlement." Id.; see Chamberlain, 294 Mass. at 7.

To date, courts in the First Circuit have rarely cited Refco. In Massachusetts, just two bankruptcy court cases have referred to the opinion. One court held that the Second Circuit case supported the proposition that the "general principle that 'party in interest standing does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding' survives." In re Hayes, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (Feeney, Bankr. J.) (quoting Refco, 505 F.3d at 115 n.10). Another case confirmed that "the moving party must be asserting its own rights and not those belonging to or derivative of a third party." In re Lopez, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) (Hillman, Bankr. J.) (citing as additional support Refco, 505 F.3d at 115 n.10).

U.S. Bank raises the policy argument that by applying Refco's reasoning in Massachusetts, this Court invites a flood of meritless litigation attacking indenture trustees. This imponderable, however, is not enough to reject an otherwise

33

logical and necessary legal conclusion.  Notably, U.S. Bank does not identify such a crisis in the Second Circuit where <u>Refco</u> has been good law for several years.[17]  A more likely outcome than chaos in the courts is that sophisticated parties like U.S. Bank will figure out how to account for any such risks through contractual terms.

As the Second Circuit cautioned in <u>Refco</u>, the "[b]ankruptcy court is a forum where creditors and debtors can settle their disputes with each other.  Any internal dispute between a creditor and that creditor's investors belongs elsewhere."  505 F.3d at 118 (emphasis omitted).

**III.  CONCLUSION**

This case presents fascinating legal and normative questions about bankruptcy, fiduciary duties, and bond offerings.  Under the Bondholders' version of facts, the indenture trustee U.S. Bank violated its fiduciary duty by favoring unsecured creditors (the residents of Reeds Landing) over its own bondholders.  The Bondholders allege they never had a chance to dispute the sale terms, which was a "sweetheart deal" for Loomis, and, indeed, ought never have had to engage in such dispute given U.S. Bank's duty to them.  Taking the facts in the light most favorable to the Bondholders, the issues that concern U.S. Bank cannot, upon

---

[17] A search of Westlaw on September 28, 2012, reveals just twenty-six cases citing <u>Refco</u>.

this record, preclude the Bondholders' claim.  The consent of U.S. Bank to the sale and perfunctory manner in which the Debtor's proposed actions were approved meant that the specific issue whether the sale was in the best interest of the Bondholders was not actually litigated.  See <u>Wade</u>, 460 F. Supp. 2d at 240.  Additionally, where the party seeking to dispute the sale had no right to be a party in interest, the issue cannot have been actually litigated on the merits.

Whether or not the Bondholders' allegations are true, the Court DENIED the motion for summary judgment, ECF No. 21, because the issues presented in this complaint were not "actually litigated" in the bankruptcy proceeding, and the parties have presented an abundance of disputed material facts.  At trial, the parties will have the opportunity to present evidence, a critical step that the parties omitted in the bankruptcy hearings and that is necessary to determine whether U.S. Bank honored its duties as indenture trustee.

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE